UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 06-100 (JDB) |
| | : | |
| v. | : | |
| | : | Sentencing hearing: September 7, 2006 |
| JOHN R. ROSS, | : | |
| Defendant. | : | |

GOVERNMENT'S MOTION FOR DOWNWARD ADJUSTMENT AND
MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this Motion for Downward Adjustment and

Memorandum in Aid of Sentencing:

BACKGROUND

On May 8, 2006, the defendant pled guilty to Threats Against the President, in violation

of 18 U.S.C. § 871.   The charge carries a maximum penalty of five years of imprisonment and

the imposition of a $250,000 fine, as well as a period of supervised release not to exceed three

years.  See 18 U.S.C. §§ 871, 3571(b)(3), 3583(b)(2).

The facts comprising the offense are summarized as follows: on February 18, 2006,

Defendant John R. Ross mailed a certified letter to the United States Secret Service (hereinafter

"USSS").  The letter set forth the defendant's "intent to kill the 43rd President of the United

States of America, George Walker Bush", possibly "next year, during the third year of his second

term, perhaps in February or in November."  The defendant also wrote, "What do you think about

the importation of a biological agent to the White House during a tour?"

On February 21, 2006, the defendant sent an e-mail to the e-mail address of Captain

Casey Taylor of the United States Marine Corps.  In the e-mail, the defendant stated, "I have determined to kill the 43rd President of the United States of America, George Walker Bush. Failing that, I have determined to bring down one of the Presidential helicopters."

The defendant was located and questioned by USSS agents on March 13, 2006.  The defendant provided a packet of materials to the agents and consented to speak to the agents. Among the materials in the packet was a copy of the above-quoted February 21, 2006, e-mail to Captain Taylor; a certified mail receipt corresponding to the February 18, 2006, letter referenced above; a letter dated March 3, 2006; a copy of the February 18, 2006, certified letter sent to the USSS; an e-mail dated March 8, 2006, sent to the Montana militia; and various e-mail printouts dated "3/8/03," specifically, an advertisement for a gun store in Idaho, a web page pertaining to obtaining an Idaho identification card and driver's license, and a web page for the Boise, Idaho Rescue Mission.[1]

The letter dated March 3, 2006 was addressed to "To whom it may concern" and contained the following text:

> The attached letter is a copy of the letter I mailed to the US Secret Service on Saturday, 18 February 2006....  On the morning of Tuesday, 21 February 2006, I sent out a number of e-mails notifying various parties that the letter had been sent, and expressly stating my intent to shoot down either the President's helicopter, Marine One, or one of the other thirteen helicopters in the squadron HMX-1....

The letter went on to outline that e-mails were sent to Captain Taylor; General Michael W.

---

[1]    A copy of these three downloaded pages are attached to this pleading at Exhibit 1. Notably, on the printout of the Idaho store advertising the sale of guns and ammunition, the defendant wrote the following at the bottom of the page: "(It is a Federal offense - felony - to export these products from Idaho w/o a Federal Weapons Permit)."

Hagee; the USSS Public Affairs web-mail link; comments@whitehouse.gov; and

vice_president@whitehouse.gov.    The correspondence ended with the following advisement: "I

have not yet contacted any right-wing organizations to request assistance with the necessary

material.  Being a right-wing conservative, I am rather disgruntled concerning the current state of

affairs in our country."

In an e-mail sent to the Montana Militia dated March 8, 2006, the defendant stated the

following:

> Gentlemen, my focus here is on our President, who is a traitor to us
> all, and who is an enemy of the people.  Frankly speaking, what I
> have been considering is the tail rotor assembly on the President's
> HMX-1 helicopters.  I'm sure you know that the President has a
> fleet of some fourteen helicopters, in Marine Helicopter Squadron
> One, and that only when the President is on-board one of them, is
> that helicopter called Marine One.  Having determined to attempt
> to shoot down one of those helos, various problems are
> encountered....That being the case, I would most sincerely
> appreciate your advice.  In the first place, it seems to me as
> someone not trained as a soldier, that it could conceivably be
> difficult to shoot down Marine One at altitude over the District,
> without having a surface-to-air missile.  Which makes it more
> likely that I would have to settle for one of the HMX-1's.  If you
> have visited Arlington National Cemetery, then you have probably
> seen them, coming around a bend in the Potomac, flying low and
> fast over the river or over one bank.
>
> I spend a lot of time at the Library of Congress, and it is not
> unusual to see Capitol Police dressed in black commando
> uniforms, carrying black assault shotguns, and hiding among the
> trees on Capitol Hill.  Acquaintances of mine report having seen
> Park Police dressed as commandos, actually in the trees, around the
> White House.  I have not verified this.  There are regular patrols of
> unmarked police boats on the Potomac.  It is likely that there are
> also Park Police officers located among the trees, along the route
> taken by the pilots of Marine Helicopter Squadron One.
>
> So, what I would like to know is, how difficult do you think it

would be to disable the tail rotor of one of the HMX-1 helos, while it is flying fast and low over the Potomac?  Specifically, I am thinking about the Sikorsky Sea-Kings.  Do you think it would be possible to disable the tail rotor on a Sikorsky Sea King, coming around a bend and flying fast and low over the Potomac, with some easily purchased weapon, like a shotgun, that is assuming the use of military ammunition?  What do you think, and, what is your recommendation?

During the March 13, 2006, interview, the defendant admitted to authoring the letter and e-mails set forth above.   The defendant also stated that he had "researched the option to shoot the tail rotor of one of the HMX helicopters with a shotgun loaded with military ordinance."  The defendant further stated that he had "researched and hypothesized that the best vantage point would be Arlington Cemetery and to shoot the helicopter as it flew low and fast over the Potomac River."  In addition, the defendant told the agents that he had done research on "the sale of military ordinance in Idaho" and looked into how to get an Idaho driver's license and where to stay in Boise, Idaho.  The defendant also provided a written statement of these facts.  When asked what the expected results of his plan would be, the defendant replied something to the effect of: "My [the defendant's] death and [the] possible deaths of the pilot if I hit the tail rotor."

## SENTENCING GUIDELINES

The plea agreement contained a number of provisions regarding the application of the United States Sentencing Guidelines (hereinafter "Guidelines").  If the Court were to adopt these sentencing recommendations, which are summarized in and endorsed by the Presentence Report, the defendant's Guidelines level would be 18, not including any adjustments.

## THE DEFENDANT'S ACCEPTANCE OF RESPONSIBILITY

The defendant has accepted responsibility for his conduct pursuant to § 3E1.1.

Specifically, the defendant was immediately forthcoming in admitting to his criminal conduct, and he entered into a timely, pre-indictment plea. The defendant also cooperated by submitting to a threat assessment conducted by personnel with the USSS in accordance with the plea agreement. Thus, he is entitled to a three level adjustment, reducing his offense level to 15. Consequently, the government respectfully requests that the Court grant its Motion for Downward Adjustment, and reduce the defendant's offense level from 18 to 15.

### ARGUMENT

Following United States v. Booker, 125 S. Ct. 738, (2005), the Court is no longer required to impose a Guidelines sentence in all cases, and its sentencing decision will be reviewed for reasonableness. Booker directs sentencing courts to fashion sentences that are consistent with the factors set forth in 18 U.S.C. § 3553(a), and that can best be done by adhering closely to the sentences derived from the Guidelines. It is the very purpose of the Guidelines to assist judges in meeting the sentencing goals of Section 3553(a). In the government's view, the most reasonable sentence in this case would be a sentence within the range calculated under the Sentencing Guidelines for an offense level of 15, criminal history category I.[2] As discussed below, there is nothing about the circumstances of this case which justify a further reduction beyond offense level 15, and the defendant has stipulated in the plea agreement that he will not seek any downward departure or decrease from this applicable Guidelines range.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the

---

[2]    Defendant has no criminal history points, placing him in criminal history category I. Accordingly, the defendant's Guidelines range is 18 to 24 months of imprisonment.

country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; © to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

**A.    The Guideline sentence is reasonable in light of the defendant's personal characteristics and circumstances.**

In this case, consideration of all the factors set forth in Section 3553(a), including the defendant's personal characteristics and circumstances, supports the conclusion that a Guidelines sentence is reasonable, and that the defendant should be sentenced within the applicable range of 18 to 24 months.

**B.    The defendant should be sentenced to the high end of the Guidelines range.**

The government asks that the Court impose a sentence of 24 months. Such a sentence is warranted by the seriousness of the conduct the defendant engaged in. First, the offense of conviction is an incredibly serious one. Threats against the President of the United States are of utmost concern to the country's national security. Consequently, a great deal of resources are expended in order to ensure the safety of the country's top leader.

6

Second, the defendant invested a great deal of thought and research into carrying out his threat. The defendant did not make vague declarations of his intention to harm the President, rather he enumerated very specific ways in which to carry out his threat – namely, by importation of a biological weapon or by shooting the tail rotor of one of the President's helicopters. He researched the make and model of Marine One, as well as who was responsible for flying the helicopters, right now to specific names of the pilots. In addition, he analyzed ways of how to shoot down the helicopters (i.e., by disabling the tail rotor) and where to do it (i.e., over the Potomac River).

Moreover, the chronology of his actions reflect the increasing escalation of his efforts. His initial February 18, 2006, letter to the USSS and February 21, 2006, e-mail to Captain Taylor referenced the use of a biological agent into the White House as a means of killing the President and his intent to shoot down one of the Presidential helicopters, respectively. His March 3, 2006, e-mail detailed that he had "not yet contacted any right-wing organizations to request assistance with the necessary material [to shoot down the President's helicopter]." The defendant then sent a March 8, 2006, e-mail to the Montana Militia, specifically requesting advice regarding his proposed plan to disable the tail rotor on the Presidential helicopters using military ammunition.

By March 8, 2006, the defendant had also made apparent preparations for acquiring the necessary ammunition to do so, as demonstrated by his downloaded copies of data related to a gun and ammunition store in Idaho, housing in Idaho, and how to get a driver's license in Idaho. Thus, the defendant's amount of research and preparation, regardless of whether or not he actually intended to actually follow through with his threats, is deeply troubling.

7

C.    **Conclusion**

As detailed above, a sentence of 24 months is reasonable and appropriate for the

defendant for several reasons.  First, that sentence is within the Guideline range and is therefore

presumptively reasonable.  Second, the offense of conviction is a particularly serious offense

given the specificity and level of preparation undertaken by the defendant.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
D.C. Bar No. 451058


_____
Denise Cheung
D.C. Bar. No. 451714
Assistant United States Attorney
555 Fourth Street, N.W., Room 11-443
Washington, D.C. 20530
202/307-2845


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that service of the foregoing was served by facsimile (202/208-
7515) and first class mail, postage pre-paid, upon counsel for the defendant, Dani Jahn, Esq.,
Office of the Federal Public Defender, 625 Indiana Avenue, N.W., Suite 550, Washington, DC
20004, this _____th day of September, 2006.


_____
Denise Cheung
Assistant United States Attorney

EXHIBIT 1